## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MELISSA DUCASTEL, individually and on behalf of a nationwide class of similarly situated individuals, | |
| Plaintiff, | Case no.   1:18-cv-03828 |
| v. | |
| The CBE GROUP, INC., d/b/a CBE GROUP, INC. or CBE GROUP, | JURY TRIAL DEMANDED |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff, MELISSA DUCASTEL (collectively "Plaintiff"), by and through her one of her attorneys of Sulaiman Law Group, Ltd., brings this Class Action Complaint against Defendant The CBE GROUP, INC., d/b/a CBE GROUP, INC. or CBE GROUP, for damages, declaratory relief and injunctive relief pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3):

### I.    INTRODUCTION

1.      This civil action arises pursuant to Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.* the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692, et seq., and the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") pursuant to 815 ILCS 505/1 et seq.

2.      Defendant is a debt collector as defined by the FDCPA and called cellular telephone number without her consent to collect on a debt of another person.

3.      Defendant violated the FDCPA by repeatedly calling Plaintiff despite her telling employees and/or agents of that she was not the person Defendant was trying to reach.

1

4. Defendant violated the TCPA by repeatedly calling Plaintiff despite her telling employees and/or agents of that she was not the person Defendant was trying to reach.

5. Defendant violated the TCPA by using autodialing technology to call Plaintiff's cellular phone because Defendant did not have Plaintiff's consent to call her utilizing autodialing technology.

6. Defendant also violated the TCPA by continuing to call her with autodialing technology her despite her telling employees and/or agents of that she was not the person Defendant was trying to reach.

7. Defendant violated the TCPA by using prerecorded and/or artificial voice messages when it called Plaintiff's cellular phone because Defendant did not have Plaintiff's consent to call her utilizing prerecorded and/or artificial voice messages.

8. Defendant also violated the TCPA by continuing to call her with prerecorded and/or artificial voice messages despite her telling employees and/or agents of that she was not the person Defendant was trying to reach.

9. Defendant's above summarized conduct also violated the ICFA because

## II. PARTIES, JURISDICTION AND VENUE

10. Plaintiff is a citizen of Illinois and resides within the Northern District of Illinois.

11. Plaintiff's cellular telephone number is 812-498-1041 (at times "Plaintiff's cellular telephone number").

12. Plaintiff is a natural "person" as defined by 47 U.S.C. §153(39)

13. CBE GROUP, INC. ("CBE" or "Defendant") is incorporated in the State of Illinois and its principal place of business is located in Iowa.

2

14. CBE is a debt collector as defined by the FDCPA because it regularly collects and attempts to collect consumer debts.

15. CBE a corporation and therefore is a "person" as defined by 47 U.S.C. §153(39).

16. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§1331 and 1337 because this is a civil action for damages arising pursuant to the TCPA and FDCPA and this case arises out of violation of federal law. *Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740 (2012).

17. Alternatively, this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d)(2) because the amount in controversy exceeds $5,000,000, in the aggregate (exclusive of interest and costs).

18. The amount in controversy easily exceeds $5,000,000, because the TCPA provides for a minimum of $500 per violation, and Plaintiff asserts a national class, which will result in at least one Class member from a different state.

19. Supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C. § 1367.

20. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(c)(1) because Plaintiff is a natural person who resides in this District.

21. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred within this District by virtue of Plaintiff being contacted by Defendant in this District.

22. Venue is proper in this District pursuant to 18 U.S.C. § 1391(b)(2) because Defendant is subject to personal jurisdiction within this District by virtue of the fact

that it has conducted significant and continuous debt collection activities within this District.

23.     Venue is proper in this District pursuant to 18 U.S.C. § 1391(c)(2) because Defendant is an entity with the capacity to sue and be sued in its common name under applicable law, and accordingly, Defendant shall be deemed to reside, where it is subject to a court's personal jurisdiction with respect to the civil action in question.

24.     Venue and personal jurisdiction exist in this District pursuant to U.S.C. §§ 1391(b)-(c) and 1441(a) because Defendant, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.

## III.    SUMMARY THE TCPA

25.     Section 227(b)(3)(A) of the TCPA states that "[a] person or entity may . . . bring . . . (A) an action based on a violation of this subjection or the regulations prescribed under this subjection to enjoin any such violation."

26.     Section 227(b)(3)(B) of the TCPA provides for a minimum of $500 in damage for each such violation" of subsection 227(b)(1)(A)(iii).

27.     Section 227(b)(3)(C) of the TCPA states:

> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

28.     Congress enacted the TCPA to regulate and prohibit certain types of automated and prerecorded telemarketing calls.

29.     In enacting the TCPA, Congress wrote that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion

of privacy, regardless of the type of call...." Telephone Consumer Protection Act of 1991,

Pub. L. 102–243, §§ 2, ¶¶ 5, 10, 12, 13, 105 Stat. 2394 (1991).

30.     On September 18, 2002, the FCC explained identified why "computerize

calls" annoy citizens:

> "Computerized calls are the scourge of modern civilization. They
> wake us up in the morning; they interrupt our dinner at night; they
> force the sick and elderly out of bed; they hound us until we want
> to rip the telephone right out of the wall . . . [O]wning a telephone
> does not give the world the right and privilege to assault the
> consumer with machine-generated telephone calls." 137 CONG.
> REC. S9874 (July 8, 1991)(statement of Sen. Hollings).

See, "Notice of Proposed Rulemaking and Memorandum Opinion and Order" (the "2002

NPRM"), fn. 90.[1]

31.     Pursuant to authority granted by the TCPA pursuant to 47 U.S.C. §

227(b)(2), the FCC has issued regulations regarding prerecorded telephone messages.

32.     Section 227(b)(2) of the TCPA which provides that the FCC "shall

prescribe regulations to implement the requirements of this subsection."

33.     47 CFR 64.1200(b)(1) is one set of regulations promulgated under the

authority of Section 227(b)(2) of the TCPA.

34.     47 CFR 64.1200(b)(1) require any person or entity that calls persons with

prerecorded messages to "identity of the business, individual, or other entity that is

responsible for initiating the call."

35.     47 CFR 64.1200(b)(1) states:

(b) All artificial or prerecorded telephone messages shall:

> (1) At the beginning of the message, state clearly the identity of the
> business, individual, or other entity that is responsible for initiating
> the call. If a business is responsible for initiating the call, the name

---

[1] The Court may take judicial notice of the 2002 NRM which can be found at:
https://apps.fcc.gov/edocs_public/attachmatch/FCC-02-250A1.pdf

under which the entity is registered to conduct business with State Corporation Commission (or comparable regulatory authority) must be stated.

36.     Defendant, to the extent it uses prerecorded messages, is required to comply with 47 CFR 64.1200(b)(1).

37.     The FCC's *Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991; Final Rule,* FR Doc 03-18766, <u>68 Fed. Reg. 143</u>, at pg. 44163 "2003 Final Rule" states:

> With respect to the caller's name, the prerecorded message must contain, at a minimum, the legal name under which the business, individual or entity calling is registered to operate. The Commission recognizes that some businesses use "d/b/as" or aliases for marketing purposes. The rule does not prohibit the use of such additional information, provided the legal name of the business is also stated.

The FCC's 2003 Final Rule can be found at <u>https://www.gpo.gov/fdsys/pkg/FR-2003-07-25/pdf/03-18766.pdf</u>

38.     47 CFR 64.1200(b)(2) is one set of regulations promulgated under the authority of Section 227(b)(2) of the TCPA.

39.     Defendant, to the extent it uses prerecorded messages, is required to comply with 47 CFR 64.1200(b)(2).

40.     47 CFR § 64.1200(b)(2) states:

> (b) All artificial or prerecorded telephone messages shall:

> > (2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity or individual.

41.     CFR 64.1200(b)(3) is one set of regulations promulgated under the authority of Section 227(b)(2) of the TCPA.

42.     Defendant, to the extent it uses prerecorded messages, is required to comply with 47 CFR 64.1200(b)(3).

43.     47 CFR § 64.1200(b)(3) states:

> In every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a [cellular telephone service], provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section. When the called person elects to opt out using such mechanism, the mechanism, must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call . . . .

44.     On information and belief, Defendant's prerecorded messages do not comply with 47 CFR 64.1200(b)(1).

45.     On information and belief, Defendant's prerecorded messages do not comply with 47 CFR 64.1200(b)(2).

46.     An aggrieved party is entitled to recover damages for violations of Sections 64.1200(b)(1) and (b)(2).  *See, e.g., Sengenberger v. Credit Control Servs.*, 2010 U.S. Dist. LEXIS 43874, *12-*14 (N.D. IL. May 5, 2010), motion to reconsider denied, 2010 U.S. Dist. LEXIS 142528 (June 17, 2010); *Roylance v. ALG Real Estate Servs.*, 2015 U.S. Dist. LEXIS 44930, *8-*10 (N.D. Cal. March 16, 2015).

47.     If Defendant failed to comply with Sections 64.1200(b)(1) and (b)(2), Plaintiff is entitled to statutory damages of $500 and up to $1,500 in damages.

48.     On information and belief, Defendant's prerecorded messages do not comply with 47 CFR 64.1200(b)(3).

49.     In 2003, the FCC declared that a "predictive dialer" constitutes an "automatic telephone dialing system" as the term "automatic telephone dialing system" is defined by the TCPA.[2]

50.     According to the FCC:

> A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because the dialer simply hangs up when no telemarketer is free to take the call.

See 2003 FCC Order at fn. 31, https://apps.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf

51.     The 2003 FCC Order explained how predictive dialers can be "set" to call consumers:

> Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (i.e., the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone.

2003 FCC Order at fn. 32.

52.     The 2003 FCC Order discussed how predictive dialers attempt "to 'predict' the average time it takes for a consumer to answer the phone."

---

[2] While Defendant(s) may disagree with the analysis performed by the FCC, as well as the FCC's conclusion that a predictive dialer constitutes an automated dialing system for the purposes of enforcing the TCPA, these allegations are intended to identify *what the FCC has publically stated*. Thus, while Defendant(s) may intend to argue that these allegations need not be answered on the grounds that they constitute "legal conclusions", FRCP 8()(1)(B) requires a party to "admit or deny the allegations asserted against it" and FRCP 8(b)(2) states that "[a] denial must fairly respond to the substance of the allegation." Further, FRCP (b)(6) states that "[a]n allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied."

53. Paragraph 146 of the 2003 FCC Order states:

> Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call. In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer [or collection agent] will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air." (footnote omitted).

54. 2003 FCC Order discussed how the use of predictive dialers result in "dead air" or hang-ups:

> the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers.

2003 FCC Order, ¶ 91.

55. Paragraph 8 of the 2003 FCC Order discussed how predictive dialers "frequently abandon calls before a [representative] is free to take the next call." 2003 FCC Order, Paragraph 8 (footnotes omitted).

56. The 2002 FCC Order described the number and types of consumer complaints that it had received regarding so-called "dead air." According to the 2002 FCC Order:

> In 1991, the Commission received a total of 757 complaints regarding calls placed to subscribers by autodialers. From June 2000 to December 2001, the Commission received over 1,500 inquiries about predictive dialing alone. In addition, the consumer alert titled "Predictive Dialing: Silence on the Other End of the Line" has received over 16,000 hits on the Commission's website since the alert was posted in February of 2001.

2002 FCC Order, ¶ 26 (footnote omitted).

57. The 2002 FCC Order explained how predictive dialers result in "disconnected" calls:

> In addition to automatically dialing numbers, predictive dialers are set up to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call. When a consumer answers the telephone, a predictive dialer transfers the call to an available telemarketer. When a predictive dialer simultaneously dials more numbers than the telemarketers can handle, some of the calls are disconnected. The consumer may hear silence on the line as the call is being transferred or a "click" as the call is disconnected.

2002 FCC Order, ¶ 26 (footnote omitted).

58.     The Court may take judicial notice that the FCC released a Declaratory Ruling on January 4, 2008 ("2008 FCC Ruling"). A copy of the 2008 FCC Ruling can be found at https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-232A1.pdf

59.     The 2008 FCC Ruling "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." 2008 FCC Ruling at ¶ 12.

60.     The 2008 FCC Ruling states that it "first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions." See, 2008 FCC Ruling at ¶ 13.

61.     The 2008 FCC Ruling described the 2002 FCC Order as follows:

> The Commission found that, based on the statutory definition of "automatic telephone dialing system," the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress. The Commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology.

2008 FCC Ruling at ¶ 13 (footnotes omitted).

62.     To the extent CBE utilized a predictive dialer to contact Plaintiff without her consent, pursuant to the 2003 FCC Order, CBE's use of a predictive dialer would

violate the TCPA.

63. The Seventh Circuit in *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) described how predictive dialers work "autonomously."

64. According to the Seventh Circuit's opinion in *Soppet*:

> The machine, called a predictive dialer, works autonomously until a human voice comes on the line. If that happens, an employee in Bill Collector's call center will join the call. But Customer no longer subscribes to Cell Number, which has been reassigned to Bystander. A human being who called Cell Number would realize that Customer was no longer the subscriber. But predictive dialers lack human intelligence and, like the buckets enchanted by the Sorcerer's Apprentice, continue until stopped by their true master.

> Meanwhile Bystander is out of pocket the cost of the airtime minutes and has had to listen to a lot of useless voicemail. (We use Bill Collector as the caller, but this simplified description could as easily use an advertiser that relies for consent on earlier transactions with Customer, or a box that Consumer checked on a vendor's web site.)

*Id.* at 638.[3]

65. Section 227(b)(1)(A)(iii) of the TCPA makes it unlawful to use any "automatic telephone dialing system" or an "artificial or prerecorded voice" to call a person's cellular telephone number "with[out] the prior express consent of the called party."

66. According to the 2008 FCC Ruling, creditors are "responsible for demonstrating that the consumer provided prior express consent.

67. According to the 2008 FCC Ruling:

> To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and

---

[3] The court was referencing the "Sorcerer's Apprentice" scene from Disney's "Fantasia". The scene can be found at http://video.disney.com/watch/sorcerer-s-apprentice-fantasia-4ea9ebc01a74ea59a5867853. Mickey Mouse's mischief begins at the 1:30 mark as well as the 2:00 mark. The result of Mickey's mischief, as referenced by the Seventh Circuit, starts at the 5:10 mark, continuing until the 8:20 mark, where the Sorcerer in question, retrieves his magical hat and saves Mickey from his mischief.

> prerecorded message calls, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent. The creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications. Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent.

2008 FCC Ruling, ¶ 10 (footnote omitted).

68.     In 2015, the FCC issued a Declaratory Ruling and Order which reaffirmed that the burden to demonstrate consent is on the caller:

> regardless of the means by which a caller obtains consent, under longstanding Commission precedent, the burden is on the caller to prove it obtained the necessary prior express consent if any question of consent is in dispute.

See July 10, 2015, Declaratory Ruling and Order, at ¶ 47. See, https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-72A1_Rcd.pdf (footnote omitted).

69.     It is Defendant's burden of proof to show that it had consent to call Plaintiff's cellular telephone number with an ATDS.

70.     It is Defendant's burden of proof to show that it had consent to call Plaintiff's cellular telephone number with a predictive dialer as this term has been defined by the FCC.

71.     It is Defendant's burden of proof to show that it had consent to call Plaintiff's cellular telephone number with prerecorded voice messages.

72.     It is Defendant's burden of proof to show that it had consent to call Plaintiff's cellular telephone number with artificial voice messages.

73.     According to the FCC's July 10, 2015 Declaratory Ruling and Order, "a called party may revoke consent at any time and through any reasonable means." *Id.*

74.     The FCC has also stated that "[a] caller may not limit the manner in which

revocation may occur." *Id.*

### IV. CBE VIOLATED THE TCPA

75.     Starting in or around March of 2018, CBE started to call Plaintiff's cellular telephone number in an attempt to collect debt owed by another person (the "subject debt").

76.     When CBE called Plaintiff's cellular phone number, CBE's calls were listed as coming from telephone numbers ending with the following last four digits: 5135, 5165 and 5093.

77.     When CBE called Plaintiff's cellular phone number, CBE's calls were listed as coming (502)305-5135.

78.     When CBE called Plaintiff's cellular phone number from an outpoint number listed as (502)305-5135 on at least four occasions.

79.     When Plaintiff answered phone calls from CBE, she was greeted with a prerecorded message.

80.     At times when Plaintiff answered phone calls from CBE and she was greeted with a prerecorded message, a live person would sometimes come on the line.

81.     CBE called Plaintiff's cellular phone number no less than a dozen times.

82.     On more than one occasion when Plaintiff spoke with a live person, Plaintiff told the person that she was not the person that Defendant was trying to reach.

83.     Despite telling a live person that she was not the person that Defendant was trying to reach, Defendant continued to call her.

84.     Plaintiff knows that at least one person understood what she was saying because the person that Plaintiff spoke with apologized for the calls.

85.     Despite the apology, the calls continued.

86.     As the entity that called Plaintiff's cellular telephone number, CBE may

not and could not limit the manner in which revocation could occur.

87.     Because Plaintiff was not the person who owed the subject debt, she had an unqualified right to revoke any consent that CBE believed that it had to call her cellular number.

88.     Plaintiff has the person called by CBE, was allowed to revoke consent at any time and through any reasonable means to the extent that CBE believed that it had consent to call her cellular number.

89.     CBE's account and/or call records associated with the debtor's account should show the amount of times that CBE placed to Plaintiff's cellular number in an attempt to collect the subject debt.

90.     CBE called Plaintiff's cellular telephone number without her consent after she told an employee and/or agent that she was not the person that CBE was trying to call.

91.     On information and belief, CBE's account notes indicate that Plaintiff told an employee or agent of CBE that she was not the person that CBE was trying to call.

92.     On information and belief, CBE's call recordings indicate that Plaintiff told an employee or agent of CBE that she was not the person that CBE was trying to call.

93.     If CBE continued to call Plaintiff after she told an employee or agent of CBE that she was not the person that CBE was trying to call, CBE would have called Plaintiff without her permission.

94.     If CBE continued to call Plaintiff after she told an employee or agent of CBE that she was not the person that CBE was trying to call, CBE would have called Plaintiff without her consent.

95. CBE called Plaintiff's cellular telephone number without her consent because CBE continued to call Plaintiff's cellular telephone number after she answered a phone call and told CBE that she was not the person that CBE was trying to call.

96. On information and belief, CBE's account and/or call records associated with Plaintiff's account show that Plaintiff has answered more than three phone calls placed by CBE to collect the subject debt.

97. On information and belief, CBE's account and/or call records associated with Plaintiff's account show that Plaintiff has answered more than six phone calls placed by CBE to collect the subject debt.

98. On information and belief, CBE's account and/or call records associated with Plaintiff's account show that Plaintiff has answered more than nine phone calls placed by CBE to collect the subject debt.

99. On information and belief, CBE's account and/or call records associated with Plaintiff's account show that Plaintiff has answered more than a dozen phone calls placed by CBE to collect the subject debt.

100. On information and belief, CBE's account and/or call records associated with Plaintiff's account show that Plaintiff has told an employee or agent of CBE that she was not the person that CBE was trying to call.

101. On information and belief, CBE's account and/or call records associated with Plaintiff's account show two or more occasions where Plaintiff told an employee or agent of CBE that she was not the person that Defendant was trying to call.

102. On information and belief, CBE's account and/or call records associated with Plaintiff's account show four or more occasions where Plaintiff told an employee or agent of CBE that she was not the person that Defendant was trying to call.

103.    On information and belief, CBE's account and/or call records associated with Plaintiff's account show six or more occasions where Plaintiff told an employee or agent of CBE that she was not the person that Defendant was trying to call.

104.    On information and belief, CBE placed to Plaintiff's cellular telephone number were placed with "predictive dialer" as this term has been defined by the Federal Communications Commission ("FCC").

105.    On information and belief, and to the best of Plaintiffs' recollection, CBE played prerecorded messages when it called Plaintiff's cellular telephone number and she answered the phone call(s).

106.    CBE's account and/or call records linked with Plaintiff's telephone number and/or associated with the subject debt would document each time that CBE played a prerecorded messages during a call to Plaintiff's telephone number.

107.    CBE's account and/or call records linked with Plaintiff's telephone number and/or associated with the subject debt would document each time that CBE left a prerecorded message on the voicemail associated with Plaintiff's cellular telephone number.

108.    Despite Plaintiff telling CBE on more than occasion to stop calling her, CBE continued to call Plaintiff's cellular telephone number in an attempt to collect the subject debt.

109.    By continuing to call Plaintiff's cellular telephone number after she told employees or agents of CBE to stop calling her, CBE willfully and/or knowingly violated the TCPA and as a result this Honorable Court should enter treble damages in accordance with Section 227(b)(3)(C) of the TCPA

110. On information and belief, based upon the following allegations, CBE made or placed the above mentioned telephone calls to Plaintiff's cellular telephone using a predictive dialer as defined by the 2003 and 2008 FCC Orders.

111. For example, when Plaintiff answered CBE's phone calls, Plaintiff experienced a prerecorded message or a few seconds of "dead air" before someone from CBE responded to Plaintiff answering the phone.

112. The instances of having to listen to a prerecorded message before someone associated with CBE spoke is consistent with the use of a "predictive dialer" as this term has been defined and described by the FCC.

113. The instances of having to wait through to three seconds of dead air before someone associated with CBE spoke is consistent with the use of a "predictive dialer" as this term has been defined and described by the FCC.

114. When Plaintiff answered CBE's phone calls, some calls were disconnected, dropped and/or abandoned before someone associated with CBE was able to speak with Plaintiff.

115. Plaintiff's experiences with disconnected, dropped and/or abandoned calls consistent with the use of a "predictive dialer" as this term has been defined and described by the FCC.

116. In light of these allegations, it is plausible to allege that CBE called Plaintiff's cellular telephone with a "predictive dialer" as this term has defined and described by the FCC.

117. Just like the plaintiffs in *Soppet*, Plaintiff "had to listen to a lot of useless voicemail" because she never authorized CBE to call her cellular telephone number with a predictive dialer

118. If CBE claims that it had "prior express consent" to call Plaintiff's cellular

telephone number with an "automatic telephone dialing system or an artificial or prerecorded voice", Plaintiff revoked any consent by telling employees and/or agents of CBE to stop calling her.

119.    On information and belief, during one or more of the calls placed by CBE, Plaintiff heard a prerecorded messages rather than live person.

120.    As a result of these violations, Plaintiff and a nationwide class of similarly situated persons are entitled to at least $500 per violation and up to $1,500 per violation.

**IV.    NATIONWIDE CLASSES ARE ASCERTAINABLE**

121.    Nationwide classes of persons who were called by CBE with "predictive dialer" (as defined by the FCC and adopted by the FCC as a form of an "automated telephone dialing system") without the consent of the persons called are ascertainable through CBE's business records.

122.    Nationwide classes of persons who were called by CBE with prerecorded or artificial voice messages without the consent of the persons called are ascertainable through CBE's business records.

123.    Nationwide classes of persons who were called by CBE with "predictive dialer" (as defined by the FCC and adopted by the FCC as a form of an "automated telephone dialing system") after persons withdrew any prior express consent that they may have provided to CBE or a prior third-party are ascertainable through CBE's business records.

124.    Nationwide classes of persons who were called by CBE with prerecorded or artificial voice messages after persons withdrew any prior express consent that they may have provided to CBE or a prior third-party are ascertainable through CBE's business records.

125.    CBE, as a debt collector, has received business records from third-parties related to consumer debts it attempts to collect.

126.    Original creditors and debt buyers are the types of third parties that have provided business records to CBE.

127.    Original creditors and debt buyers have provided CBE with business records which identify default consumer debts.

128.    For example, original creditors and debt buyers have provided CBE with business records which identify the amount and age of consumer debts.

129.    Original creditors and debt buyers have provided CBE with business records which identify the primary telephone number of a consumer debtor.

130.    Original creditors and debt buyers have provided CBE with business records which identify the primary telephone number of a consumer debtor.

131.    On information and belief, original creditors have provided CBE with business records which identify whether consumer debtors have provided original creditors with consent to call debtors with automated telephone dialing technology.

132.    On information and belief, original creditors have provided CBE with business records which identify whether consumer debtors have provided original creditors with consent to call debtors with prerecorded or artificial voices messages.

133.    Original creditors and debt buyers have provided CBE with business records which demographic information regarding consumers with defaulted debts.

134.    For example, original creditors and debt buyers have provided CBE with demographic records which identify telephone numbers received by creditors.

135.    Original creditors and debt buyers have provided CBE with demographic records which identify the street address, city and state of consumer debtors.

136.   Original creditors and debt buyers have provided CBE with demographic records which identify the social security number of consumer debtors.

137.   On information and belief, CBE receives telephone numbers of debtors from creditors where creditors have informed CBE that that the creditors have obtained the telephone numbers directly from debtors.

138.   On information and belief, CBE receives telephone numbers of debtors from subsequent creditors (sometimes referred to as debt buyers) where subsequent creditors/debt buyers have informed CBE that they have obtained the telephone numbers directly from the original creditor.

139.   On information and belief, CBE obtains telephone numbers of debtors by utilizing skip-trace services provided by third-parties.

140.   On information and belief, CBE receives telephone numbers of debtors from subsequent creditors (often referred to as debt buyers) where subsequent creditors/debt buyers have informed CBE that they have obtained the telephone numbers directly from debtors.

141.   CBE, as a debt collector, maintains business records related to debts it has attempted to collect.

142.   CBE should and does maintain business records regarding telephone numbers that it receives from original creditors for the purpose of collecting consumer debts.

143.   CBE should and does maintain business records regarding telephone numbers that it receives from debt buyers for the purpose of collecting consumer debts.

144.   CBE maintains business records regarding telephone numbers that it obtains from third party skip trace sources.

145. CBE maintains business records regarding telephone numbers that it calls for the purpose of collecting consumer debts.

146. CBE maintains business records of telephone numbers that it has called in order to attempt to collect consumer debts.

147. For example, CBE maintains business records which show the time and date that it called particular consumer debtor.

148. CBE maintains business records which show the duration of a particular called placed by it in an effort to collect a consumer debtor.

149. CBE maintains business records which show the result of calls placed by it in an effort to collect a consumer debtor.

150. For example, with regard to calls placed to collect consumer debts, on information and belief, CBE maintains business records which show whether a particular telephone call resulted in contact with the consumer debtor that it was trying to reach.

151. Alternatively, with regard to calls placed to collect consumer debts, on information and belief, CBE maintains business records which show whether a particular telephone call resulted in contact with an unknown or unidentified person.

152. For example, as a debt collector, CBE has policies which require its employees and agents to verify that they are speaking with the debtor in question before its employees and agents can disclose that they are calling the debtor regarding the collection of a debt.

153. On information and belief, CBE has policies which require its employees and agents to document that they have verified the identity of a particular debtor by typing words into an account note field to document that verification has occured.

154. On information and belief, CBE has policies which require its employees and agents to document that they have verified the identity of a particular debtor by typing certain required abbreviations into an account note field to document that verification has occurred.

155. On information and belief, CBE has policies which require its employees and agents to document that they have verified the identity of a particular debtor by typing certain required acronyms into an account note field to document that verification has occurred.

156. On information and belief, CBE has policies which require its employees and agents to document that they have verified the identity of a particular debtor by entering or submitting a numeric code in the debtor's account records to document that verification has occurred.

157. On information and belief, CBE has policies which require its employees and agents to document that they have verified the identity of a particular debtor by entering or submitting a letter or alpha code in the debtor's account records to document that verification has occurred.

158. On information and belief, CBE has policies which require its employees and agents to document that they have verified the identity of a particular debtor by clicking on a tab or result prompt in the debtor's account records to document that verification has occurred.

159. For example, on information and belief, CBE require its employees and agents to document that they have verified the identity of a particular debtor by clicking on a tab in the debtor's account records which may say "verified contact with debtor" or similar words.

160.   On information and belief, CBE has policies which require its employees or agents to document contact with persons where a telephone call results in contact with a person on the receiving end of the call and the employee or agent is not able to verify that he or she was speaking with the debtor that CBE was attempting to call.

161.   On information and belief, CBE has policies which require its employees and agents to document when a person answers a telephone call placed by CBE or on behalf of CBE and the employee or agent was unable to verify that the person answering the call was the debtor.

162.   On information and belief, CBE requires its employees and agents to document that they have been unable to verify the identity of the person answering a call placed by CBE by typing words into an account note field to document that verification did not take place.

163.   On information and belief, CBE requires its employees and agents to document that they have been unable to verify the identity of the person answering a call placed by CBE by typing certain required abbreviations into an account note field to document that verification did not take place.

164.   On information and belief, CBE requires its employees and agents to document that they have been unable to verify the identity of the person answering a call placed by CBE by typing certain required acronyms into an account note field to document that verification did not take place.

165.   On information and belief, CBE requires its employees and agents to document that they have been unable to verify the identity of the person answering a call placed by CBE by entering or submitting a numeric code in the debtor's account records to document that verification did not take place.

166. On information and belief, CBE requires its employees and agents to document that they have been unable to verify the identity of the person answering a call placed by CBE by entering or submitting a letter or alpha code in the debtor's account records to document that verification did not take place.

167. On information and belief, CBE requires its employees and agents to document that they were unable to verify the identity of the person answering a call by clicking on a tab or result prompt in the debtor's account records to document that verification has taken place.

168. For example, on information and belief, CBE requires its employees and agents to document that they were unable to verify the identity of the person answering a call by clicking on a tab in the debtor's account records which may say "contact with unknown person" or similar words.

169. On information and belief, CBE has policies which require its employees to document, in the collection notes of a particular account, the name of the person on the receiving end of the phone call – to the extent that the person on the receiving end of the phone call provides his or her name to the employee.

170. On information and belief, CBE has policies which require its employees to document, in the collection notes of a particular account, the relationship (if any) that the person on the receiving end of the phone call has with the debtor in question – to the extent that the person on the receiving end of the phone call is willing to tell the employee his or her relationship to the debtor.

171. On information and belief, CBE has policies which require its employees and/or agents to document when a verified debtor answers a phone call placed by CBE and asks or tells an CBE employee or agent to stop calling the debtor.

172. For example, on information and belief, CBE has a policy which requires employees and/or agents to type words into an account note field to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor.

173. On information and belief, CBE has a policy which requires employees and/or agents to type certain abbreviations into a debtor's account records to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor.

174. On information and belief, CBE has a policy which requires employees and/or agents to type certain acronyms into a debtor's account records to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor.

175. On information and belief, CBE has a policy which requires employees and/or agents to type or enter a specific numeric code into a debtor's account records to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor.

176. On information and belief, CBE has a policy which requires employees and/or agents to type or enter a specific letter or alpha code into a debtor's account records to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor.

177. On information and belief, CBE has a policy which requires employees and/or agents to click on a tab or result prompt in the debtor's account records to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor.

178. For example, on information and belief, CBE require its employees and agents to document when a debtor has told or asked a CBE employee or agent to stop calling the debtor by clicking on a tab in the debtor's account records which may say "do not call" or similar words.

179.   If CBE's employees and/or agents document were required to document stop calling requests into the account note field of the debtor that CBE was trying to reach, CBE's database of account notes can be searched to locate documented stop calling requests.

180.   If CBE's employees and/or agents document stop calling requests by entering a specific numeric or letter code into a field in the account records of the debtor in question, CBE's database of account records can be searched to locate documented stop calling requests.

181.   If CBE's employees and/or agents document stop calling requests by clicking on a particular tab in the account records of the debtor in question, CBE's database of account records can be searched to locate documented stop calling requests.

182.   On information and belief, CBE has policies which require its employees to document, in the collection notes of a particular account, when an unidentified person answers a phone call placed by CBE and asks or tells an CBE employee or agent that CBE is calling the "wrong number" or the "wrong person" (hereafter a "wrong party call").

183.   On information and belief, CBE has policies which require its employees and/or agents to document, in the collection notes of a particular account, when an unidentified person makes an inbound call to CBE and tells an CBE employee or agent to stop calling his or her telephone number because the unidentified person is not the person CBE is trying to reach.

184.   If CBE's employees and/or agents document stop "wrong party calls" in the account notes of debtors, CBE's account notes can be searched to locate documented "wrong party calls" made by unidentified persons.

185.    Alternatively, on information and belief, CBE has policies which require its employees and/or agents to enter a specific code in the account records of the debtor in question document when an unknown person answers a phone call placed by CBE and asks or tells an CBE employee and/or agent that CBE is calling the wrong person or the wrong number.

186.    If CBE's employees and/or agents document stop call requests made by unknown by entering a specific code in the account records of debtor in question, CBE's account records can be searched to locate documented "wrong party calls" made by unknown persons.

187.    On information and belief, CBE has policies which require its employees to document, in the collection notes of a particular account, when an unidentified person answers a phone call placed by CBE and asks or tells a CBE employee or agent to stop calling.

188.    On information and belief, CBE has policies which require its employees and/or agents to document, in the collection notes of a particular account, when a an unidentified person makes an inbound call to CBE and asks or tells an CBE employee or agent to stop calling his or her telephone number.

189.    If CBE's employees and/or agents document stop calling requests in the account notes of debtors, CBE's account notes can be searched to locate documented stop calling requests made by unidentified persons.

190.    Alternatively, on information and belief, CBE has policies which require its employees and/or agents to enter a specific code in the account records of the debtor in question document when an unknown person answers a phone call placed by CBE and asks or tells an CBE employee and/or agent to stop calling.

191.   If CBE's employees and/or agents document stop call requests made by unknown by entering a specific code in the account records of debtor in question, CBE's account records can be searched to locate documented stop calling requests made by unknown persons.

192.   On information and belief, CBE maintains business records which show the type of dialing method utilized by CBE which led to the particular result identified in the above paragraph.

193.   In particular, on information and belief, CBE maintains business records which identify whether a call that led to the result identified in the above paragraph was made with a particular form of dialing technology.

194.   For example, on information and belief, CBE maintains business records which identify whether a call that led to the result identified in the above paragraph was made with automated telephone technology.

195.   Accordingly, on information and belief, when CBE's business records can show that a particular telephone call resulted in the person answering CBE's telephone call informing a representative of CBE that he or she was not the person that CBE was trying to reach, CBE's business records will also show what type of dialing system was utilized by CBE to place the call.

196.   On information and belief, where CBE's business records can show that a particular telephone call resulted in a person answering CBE's telephone call informing a representative of CBE to stop calling, CBE's business records will also show what type of dialing system was utilized by CBE to place the call.

197.   On information and belief, where CBE's business records can show that a particular telephone call resulted in person answering CBE's telephone call informing a representative of CBE that he or she was not the person that CBE was trying to reach,

CBE's business records will also show what type of dialing system was utilized by CBE to place the call.

198.   If CBE played prerecorded messages on voicemails of telephone number that it called, CBE's business records would be able to identify that it played prerecorded messages on voicemails of the particular telephone numbers that it called.

199.   If CBE played prerecorded messages during a call that it placed, CBE's business records would be able to identify that it played prerecorded messages during calls that it made to particular telephone number that it called.

200.   As alleged above, CBE's demographic database can be searched to identify putative class members by searching CBE's narrative account note entries to identify called parties who fall within CBE's policies regarding the documentation of contact with called parties through typed narrative entries, abbreviations or acronyms.

201.   As alleged above, CBE's demographic database can be searched to identify putative class members by searching CBE's alpha or numeric code entries to identify called parties who fall within CBE's policies regarding the documentation of contact with called parties by and through the input of alpha or numeric codes.

202.   There are commercially available programs, websites and databases which can be utilized to identify the person associated with a particular telephone number where the telephone number appears in CBE's business records.

**V.    PLAINTIFF HAS SUFFERED CONCRETE INJURIES**

203.   The Supreme Court had recognized that "[v]oluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 744 (2012).

204.   The Supreme Court has also recognized that in enacting the TCPA,

Congress made specific findings that "unrestricted telemarketing can be an intrusive invasion of privacy" and are a "nuisance." *Mims,* 132 S. Ct. at 745.

205. In discussing whether a statutory violation affords a person Article III standing to assert a cause of action in federal court, the Supreme Court recognized that Congress has the power to enact laws to elevate certain harms "to the status of legally cognizable injuries." *Spokeo, Inc., v. Robbins*, 136 S. Ct. 1540, 1549 (2016).

206. *Spokeo* stated that "both history and the judgment of Congress play important roles" and "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements...Congress may 'elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *Id.*

207. *Spokeo* recognized that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id. Spokeo* also recognized that "a plaintiff . . . need not allege any additional harm beyond the one Congress has identified."

208. After the Supreme Court's June 17, 2016, decision in *Spokeo*, courts in the following TCPA cases held that plaintiffs properly alleged concrete and legally cognizable harms. *See, e.g., Susinno v. Work Out World Inc.*, 862 F.3d 346, 348 (3d Cir. 2017) (holding that Article III standing existed where a TCPA plaintiff received a a "single solicitation" to her cell phone from a fitness company that resulted in the "receipt of [a] call and voicemail"); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding two unwanted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect"); *Hossfeld v. Compass Bank*, 2017 U.S. Dist. LEXIS 182571, *14-15 (N.D. Al. Nov. 3, 2017) ("Mr. Hossfeld has undoubtedly cleared the particularity

hurdle and asserted a personal connection to the harm claimed that is sufficient to establish this prong of the standing requirement. The two unsolicited calls described in Ms. Hossfeld's first amended complaint were made to his personal cell phone number. (Doc. 12 at 4 ¶ 17). Mr. Hossfeld further alleges how those automatically-dialed calls impacted him personally—they temporarily deprived him from being able to use his cell phone, invaded his privacy, wasted his time, and reduced his cell phone's battery's life. (Doc. 12 at 7 ¶ 40).”); _Etzel v. Hooters of Am., LLC_, 223 F. Supp. 3d 1306, 1311, 1312 (N.D. Ga. 2016) (rejecting application of _de minimis_ rule to "a lone text message after withdrawal of consent" (internal quotation marks omitted) given "the [unambiguous] language of the TCPA . . . that a violation can occur from a single call" under § 227(b)(1)(A) in contrast to § 227(c)(5) which requires more than one call); _Cabiness v. Educ. Fin. Solutions, LLC_, 2016 U.S. Dist. LEXIS 142005, 2016 WL 5791411, at *5-6 (N.D. Cali. Sept. 1, 2016)(a violation of the TCPA "is sufficient on its own to constitute an injury in fact" because "[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm"); _Cour v. Life360, Inc._, 2016 U.S. Dist. LEXIS 98945, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (finding concrete injuries where plaintiff alleged he received one text message in violation of the TCPA).

## COUNT I – INDIVIDUAL CLAIM FOR VIOLATIONS OF THE TCPA
## AUTODIALED AND/OR PREDICTIVELY DIALED CALLS WITHOUT CONSENT

209.   Plaintiff realleges the above paragraphs as though fully set forth herein.

210.   As set forth above, Defendant called Plaintiff with an autodialer or a predictive dialer without her consent.

211.   Alternatively, Defendant called Plaintiff with an autodialer or a predictive dialer after Plaintiff told Defendant to stop calling her, thereby revoking any consent

which Defendant may believe that it had to call Plaintiff through the use of an autodialer or a predictive dialer.

212.  Defendant's calls to Plaintiff caused Plaintiff to suffer real and concrete harm.

213.  Defendant knew that its dialing practices were in violation of the TCPA, yet continued to employ them to increase profits at Plaintiff's frustration, well-being and expense.

214.  Defendant, through its agents, representatives and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

215.  Alternatively, pursuant to the 2008 FCC Ruling, if CBE placed the calls, the creditor to the debts at issue is/are liable for all autodialed or predictively dialed calls and artificial or prerecorded voice messages that CBE made or placed to Plaintiff's cellular telephone.

216.  The 2008 FCC Ruling state as follows:

> [A] creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.

See, FCC's January 8, 2008 Ruling, p. 7 (footnote omitted).

217.  Pursuant to 47 U.S.C. §227(b)(3)(B), Defendant should be held liable to Plaintiff for a minimum of $500 per call.

218.  Defendant continued to call Plaintiff after she told Defendant to stop calling her.

219. Accordingly, Defendant's willful and knowing violations of the TCPA support the entry of treble the damages in favor of Plaintiff pursuant to 47 U.S.C. §227(b)(3)(C).

WHEREFORE, Plaintiff respectfully requests that this Honorable Court issue the following relief:

a. Declare that Defendants' phone calls to Plaintiff to be violations of the TCPA;
b. enjoin Defendants from contacting Plaintiff in violation of the TCPA;
c. award Plaintiff damages of at least $500 per phone call and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and
d. award Plaintiff any other relief this Honorable Court deems equitable and just.

### COUNT II – CLASS BASED CLAIM FOR VIOLATIONS OF THE TCPA AUTODIALED AND/OR PREDICTIVELY DIALED CALLS WITHOUT CONSENT

220. Plaintiff realleges the above paragraphs as though fully set forth herein.

221. As set forth above, Defendant called Plaintiff with an autodialer or a predictive dialer without her consent.

222. Alternatively, Defendant called Plaintiff with an autodialer or a predictive dialer after Plaintiff told Defendant to stop calling her, thereby revoking any consent which Defendant may believe that it had to call Plaintiff through the use of an autodialer or a predictive dialer.

223. Defendant called more than forty persons with an autodialer or a predictive dialer without their consent.

224. Defendant's calls to Plaintiff and the putative class members caused Plaintiff and the putative class members to suffer real and concrete harm.

225. Defendant knew that its dialing practices were in violation of the TCPA, yet continued to employ them to increase profits at class members' frustration, well-being and expense.

226.   The proposed classes can be defined as:

All persons in the United States who were called by Defendant on their cellular telephone numbers within four years of the filing of this Complaint where Defendant's calls were made using an autodialer or predictive dialer system.

227.   Because Defendant has the burden of proof on whether it had consent to call Plaintiff and the proposed class members with an autodialer and/or predictive dialer, the above proposed class definition does not contain reference to whether Defendant had consent to call the cellular numbers in the manner described.

228.   Defendant, through its agents, representatives and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

229.   Alternatively, pursuant to the 2008 FCC Ruling, if CBE placed the calls, the creditor to the debts at issue is/are liable for all autodialed or predictively dialed calls and artificial or prerecorded voice messages that CBE made or placed to Plaintiff's cellular telephone.

230.   The 2008 FCC Ruling state as follows:

[A] creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.

See, FCC's January 8, 2008 Ruling, p. 7 (footnote omitted).

231.   Pursuant to 47 U.S.C. §227(b)(3)(B), Defendant should be held liable to Plaintiff and the putative class members for a minimum of $500 per call.

232.   Defendant continued to call Plaintiff and other class members after they told Defendant to stop calling them.

233. Accordingly, Defendant's willful and knowing violations of the TCPA support the entry of treble the damages to favor of Plaintiff and the putative class members pursuant to 47 U.S.C. §227(b)(3)(C).

WHEREFORE, Plaintiff, on behalf of a class of similarly situated individuals, respectfully requests that this Honorable Court issue the following relief:

a. declare that Defendants' phone calls to Plaintiff and similarly situated class members to be violations of the TCPA;

b. enjoin Defendants from contacting Plaintiff and similarly situated class members in violation of the TCPA;

c. award Plaintiff and class members damages of at least $500 per phone call and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and

d. award Plaintiff and similarly situated class members any other relief this Honorable Court deems equitable and just.

### COUNT III – INDIVIDUAL CLAIM FOR VIOLATIONS OF THE TCPA
### PRE-RECORDED AND/OR ARTIFICIAL VOICE MESSAGES WITHOUT CONSENT

234. Plaintiff the above paragraphs as though fully set forth herein.

235. As set forth above, Defendant called Plaintiff's cellular telephone number with prerecorded and/or artificial voice messages without her consent.

236. Alternatively, Defendant called Plaintiff's cellular telephone number with prerecorded and/or artificial voice messages after Plaintiff told Defendant to stop calling her, thereby revoking any consent which Defendant may believe that it had to call Plaintiff's cellular telephone number and play prerecorded and/or artificial voice messages.

237. Defendant's prerecorded and/or artificial voice messages to Plaintiff caused Plaintiff to suffer real and concrete harm.

238. Defendant's prerecorded and/or artificial voice messages to Plaintiff did not comply with the requirements set forth by 47 CFR 64.1200(b)(1).

239. Defendant's prerecorded and/or artificial voice messages to Plaintiff caused Plaintiff to suffer real and concrete harm because the messages failed to comply with regulations duly authorize by 47 CFR 64.1200(b)(1).

240. Defendant's prerecorded and/or artificial voice messages to Plaintiff did not comply with the requirements set forth by 47 CFR 64.1200(b)(2).

241. Defendant's prerecorded and/or artificial voice messages to Plaintiff caused Plaintiff to suffer real and concrete harm because the messages failed to comply with regulations duly authorized by 47 CFR 64.1200(b)(2).

242. Defendant's prerecorded and/or artificial voice messages to Plaintiff caused Plaintiff to suffer real and concrete harm because the messages failed to comply with regulations duly authorized by 47 CFR 64.1200(b)(2).

243. Defendant knew that its dialing practices were in violation of the TCPA, yet continued to employ them to increase profits at Plaintiff's frustration, well-being and expense.

244. Defendant, through its agents, representatives and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

245. Alternatively, pursuant to the 2008 FCC Ruling, if CBE placed the calls, the creditor to the debts at issue is/are liable for artificial or prerecorded voice messages that CBE made or placed to Plaintiff's cellular telephone.

246. The 2008 FCC Ruling state as follows:

> [A] creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.

See, FCC's January 8, 2008 Ruling, p. 7 (footnote omitted).

247.    Pursuant to 47 U.S.C. §227(b)(3)(B), Defendant should be held liable to Plaintiff for a minimum of $500 per call.

248.    Defendant continued to call Plaintiff and played prerecorded or artificial voice messages during the subject calls.

249.    Accordingly, Defendant's willful and knowing violations of the TCPA support the entry of treble the damages in favor of Plaintiff pursuant to 47 U.S.C. §227(b)(3)(C).

WHEREFORE, Plaintiff respectfully requests that this Honorable Court issue the following relief:

a.  declare Defendants pre-recorded and/or artificial voice messages to Plaintiff to be violations of the TCPA;

b.  enjoin Defendants from contacting Plaintiff in violation of the TCPA;

c.  award Plaintiff damages of at least $500 per phone call and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and

d.  award Plaintiff any other relief this Honorable Court deems equitable and just.

### COUNT IV – CLASS BASED CLAIM FOR VIOLATIONS OF THE TCPA
### PRE-RECORDED AND/OR ARTIFICIAL VOICE MESSAGES WITHOUT CONSENT

250.    Plaintiff realleges the above paragraphs as though fully set forth herein.

251.    As set forth above, Defendant called Plaintiff's cellular telephone number with prerecorded and/or artificial voice messages without her consent.

252.    Alternatively, Defendant called Plaintiff's cellular telephone number with prerecorded and/or artificial voice messages after Plaintiff told Defendant to stop calling her, thereby revoking any consent which Defendant may believe that it had to call Plaintiff's cellular telephone number and play prerecorded and/or artificial voice messages.

253. Defendant called more than forty persons with prerecorded and/or artificial voice messages without their consent.

254. Defendant's calls to Plaintiff and the putative class members caused Plaintiff and the putative class members to suffer real and concrete harm.

255. Defendant knew that its dialing practices were in violation of the TCPA, yet continued to employ them to increase profits at class members' frustration, well-being and expense.

256. The proposed classes can be defined as:

> All persons in the United States who were called by Defendant on their cellular telephone numbers within four years of the filing of this Complaint where Defendant's calls were made using pre-recorded or artificial voice messages during the calls.

257. Because Defendants bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members with pre-recorded and/or artificial voice messages, the above proposed class definitions do not refer to consent or the revocation of consent.

258. Defendant's prerecorded and/or artificial voice messages to Plaintiff caused Plaintiff to suffer real and concrete harm.

259. Defendant knew that its dialing practices were in violation of the TCPA, yet continued to employ them to increase profits at Plaintiff's frustration, well-being and expense.

260. Defendant, through its agents, representatives and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

261. Alternatively, pursuant to the 2008 FCC Ruling, if CBE placed the calls, the creditor to the debts at issue is/are liable for artificial or prerecorded voice messages that CBE made or placed to Plaintiff's cellular telephone.

262. The 2008 FCC Ruling state as follows:

> [A] creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.

See, FCC's January 8, 2008 Ruling, p. 7 (footnote omitted).

263. Pursuant to 47 U.S.C. §227(b)(3)(B), Defendant should be held liable to Plaintiff for a minimum of $500 per call.

264. Defendant continued to call Plaintiff and played prerecorded or artificial voice messages during the subject calls.

265. Accordingly, Defendant's willful and knowing violations of the TCPA support the entry of treble the damages in favor of Plaintiff and the putative class members pursuant to 47 U.S.C. §227(b)(3)(C).

WHEREFORE, Plaintiff, on behalf of a class of similarly situated individuals, respectfully requests that this Honorable Court issue the following relief:

a. declare Defendants' phone calls to Plaintiff and similarly situated class members to be violations of the TCPA;
b. enjoin Defendants from calling Plaintiff and similarly situated class members in violation of the TCPA;
c. award Plaintiff and class members damages of at least $500 per phone call and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and
d. award Plaintiff and similarly situated class members any other relief this Honorable Court deems equitable and just.

### COUNT V – INDIVIDUAL VIOLATIONS OF THE FDCPA

266. Plaintiff realleges the above paragraphs as though fully set forth herein.

267. As pled above, Plaintiff was harmed by the calls to her cellular phone.

268. CBE is a debt collector as the term is defined by the TCPA.

269. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violates the FDCPA.

270. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated § 1692d because calling Plaintiff with a predictive dialer and/or autodialer without her consent was harassing, oppressive and abusive.

271. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated § 1692d because calling Plaintiff with pre-recorded and/or artificial voice messages without her consent was harassing, oppressive and abusive.

272. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated § 1692d(5) by calling Plaintiff at least 100 times and thus "repeatedly or continuously with intent to annoy, abuse, or harass".

273. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated §1692e when it engaged in false, deceptive, or misleading representations or means in connection with the collection of a debt because when it called Plaintiff with an autodialer and/or predictive dialer, it had no legal right to do so.

274. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated §1692e when it engaged in false, deceptive, or misleading representations or means in connection with the collection of a debt because when it called Plaintiff with pre-recorded and artificial voice messages, it had no legal right to do so.

275. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated §1692e(2) when it falsely misrepresented that it had the legal right to place autodialed and/or predictively dialed calls to Plaintiff's cellular phone without her consent.

276. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated §1692e(2) when it falsely misrepresented that it had the legal right to call

Plaintiff's cellular phone with pre-recorded and/or artificial voice messages without her consent.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a. declare that the practices complained of herein are unlawful and violate the FDCPA;

b. enjoin Defendant CBE from contacting Plaintiff in violation of the FDCPA;

c. award Plaintiff statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

d. award Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

e. award Plaintiff any other relief this Honorable Court deems equitable and just.

### COUNT VI – CLASS BASED VIOLATIONS OF THE FDCPA

277.  Plaintiff realleges the above paragraphs as though fully set forth herein.

278.  On information and belief, CBE contacted over 40 persons in the same manner as set forth in the preceding Count V.

279.  Pursuant to 15 U.S.C. § 1692k, Plaintiff and the Class are entitled to actual damages, statutory damages, attorneys' fees and costs.

280.  Plaintiff brings this Count on behalf of the following putative class.

281.  The proposed class can be provisionally defined as follows:

Class A - false and deceptive autodialed calls: All persons to whom CBE placed calls where CBE falsely misrepresented that it had the legal right to place autodialed and/or predictively dialed calls to the recipients' cellular phone without their consent.

Class B - the use of false and deceptive practices with regard to playing prerecorded messages during: All persons to whom CBE placed calls where CBE falsely misrepresented that it had the legal right to place calls with prerecorded or artificial voice messages during the calls to the recipients' cellular phone without their consent.

Class C – the use of false and deceptive practices with regard to leaving recorded messages on recipients" voicemails: All persons to whom CBE placed calls where CBE falsely misrepresented that it had the legal

right to place calls and leave prerecorded or artificial voice messages on recipients' cellular phone without their consent.

Class D – harassing and abusive calls: All persons to whom CBE placed calls where CBE continued to call them after more than two occasions where recipients told CBE to stop calling them.

282. CBE's repeated and unwanted calls to Plaintiff's cellular telephone number violated §1692e(2) when it falsely misrepresented that it had the legal right to call Plaintiff's cellular phone with pre-recorded and/or artificial voice messages without her consent.

WHEREFORE, Plaintiff requests that this Honorable Court:

a. declare that the practices complained of herein are unlawful and violate the FDCPA;

b. enjoin Defendant CBE from continuing to violate the FDCPA;

c. award Plaintiff and putative class members statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

d. award Plaintiff and class members costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

e. award Plaintiff and the putative class members any other relief this Honorable Court deems equitable and just.

## COUNT VII – INDIVIDUAL AND CLASS BASED VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

283. Plaintiff realleges the above paragraphs as through fully set forth herein.

284. Defendant violated the ICFA which states in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

285.   Plaintiff is a "person" and a "consumer" as defined in ICFA, 815 ILCS 505/ (c) and (e) respectively.

286.   CBE is engaged in commerce in the State of Illinois through its debt collection activitries.

287.   CBE violated 815 ILCS 505/2 by engaging in unfair by continuing to call Plaintiff without her consent.

288.   It was unfair for CBE call Plaintiff through repeated autodialed phone calls for someone else's debt.

289.   It was unfair and deceptive for CBE to contact Plaintiff through means of an ATDS when it had no reason or permission to do so.

290.   It was unfair for CBE to continue placing calls to Plaintiff after it knew that it did not have consent to do so.

291.   CBE's unfair and deceptive conduct is inherently oppressive as Plaintiff had no choice but to submit to the relentless harassing phone calls to her cellular phone.

292.   Moreover, CBE's unfair conduct is against public policy because upon information and belief, CBE has subjected many Illinois consumers to unsolicited and unwanted autodialed and/or predictively dialed calls, resulting in significant harm in the form of invasion of privacy.

293.   Upon information and belief, CBE systematically places harassing phone calls to consumers in Illinois in order to collect debts owed to others.

294.   Placing debt collection phone calls to Illinois consumers without the recipient's consent is an unfair business practice willfully employed by CBE and is done on a large scale.

295.    CBE's unlawful debt collection calls to Plaintiff and persons like Plaintiff without their consent gives it an unfair competitive advantage over businesses that only call persons for whom they have consent.

296.    CBE's unlawful debt collection calls to Plaintiff and persons like Plaintiff without their consent gives it an unfair competitive advantage over businesses that calling people after they are told that they are calling the wrong person.

297.    Defendant also violated the TCPA, and therefore Illinois public policy by failing to utilize prerecorded messages that comply with 47 CFR 64.1200(b)(1), 47 CFR 64.1200(b)(2) and 47 CFR 64.1200(b)(3).

298.    As alleged above, Plaintiff was substantially harmed by CBE's misconduct.

299.    On information and belief, at least 40 residents of Illinois have been similarly harmed by Defendant's unlawful conduct.

300.    CBE's conduct in continuing to call Plaintiff and others after they told CBE that they were not the person CBE was trying to reach was outrageous, willful and wanton, showed a reckless disregard for the rights of Plaintiff and consumers, generally, and Plaintiff had no choice but to submit to the harassing phone calls.

WHEREFORE, Plaintiff, individually and on behalf of a class of similarly situated Illinois residents, respectfully requests that this Honorable Court:

a.  enter judgment in the class's favor and against CBE;
b.  enjoin further unlawful conduct;
c.  award Plaintiff and damages in an amount to be determined at trial;
d.  award punitive damages in an amount to be determined at trial;
e.  award Plaintiff her reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a(c); and
f.  award Plaintiff any other relief this Honorable Court deems equitable and just.

## VI.    THE ELEMENTS OF FRCP 23 ARE MET

301.   As noted above, putative class members can be administratively ascertained from business records maintained by Defendant.

302.   These records can be examined to identify the types of calling systems utilized, whether prerecorded or artificial voice messages were used and whether consent was provided and/or revoked.

303.   It is proper to certify a class where a defendant's records allow the parties to ascertain class members.   *See, e.g., In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 397 (3d Cir. 2015) (finding that the Plaintiffs' proposed class was ascertainable because the defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

304.   A defendant in a TCPA action bears the burden of demonstrating consent.

305.   Defendant(s) may seek to exclude from these proposed classes people who consented to the calls and messages in question.

306.   Excluded from the Classes are Defendants, their agents, subsidiaries, parents, successors, predecessors, and any entity in which those parties, or their parents have a controlling interest, and those entities' current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family and staff, (3) any person who executes and files a timely request for exclusion from the Class, (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded, adjudicated and/or otherwise released person.

307.   Plaintiff reserves the right to modify the class definitions to negate any efforts by Defendant(s) to suggest that the above classes are failsafe classes.

**A.**     **Numerosity**

308.   Numerosity is satisfied because Defendant(s) called hundreds of persons in the same manner that Defendants called Plaintiff.

309.   Joinder of all members of the Class is impracticable.

**B.    Commonality and Predominance**

310.   The elements of is commonality and predominance are satisfied.

311.   As to the TCPA based classes, commonality exists because Defendant(s) acted in a common manner toward Plaintiff and the proposed class members by calling Plaintiff and the proposed class members in the same way:   (a) through dialing technology prohibited by the TCPA (either an automated dialing system, predictive dialer, prerecorded messages and/or artificial messages) and (b) without consent of the person called.

312.   There are several questions of law and fact common to the claims of Plaintiff and members of the proposed classes, including;

a.    whether the dialing systems used by Defendant(s) qualify as an automated telephone dialing system or a predictive dialer under the TCPA; and

b.    whether Defendant(s) violated the TCPA and FDCPA;

c.    whether alleged  conduct violated the Illinois Automatic Telephone Dialers Act;

d.    whether Defendant(s) can demonstrate consent under the TCPA; and

e.    whether the conduct described herein was intentional so as to warrant treble or punitive damages.

**C.    Typicality**

313.   Plaintiff's claims are typical of the claims of the proposed Class, as the calls that Defendant(s) placed were the same or substantially similar to those received by the proposed class members.

314. Plaintiff's and the proposed class members' claims all arise from the same operative facts and are based on the same legal causes of action.

315. Plaintiff and each of the proposed class member are all subject to the same illegal calling techniques employed by Defendant(s).

**D.    Appropriateness and Superiority**

316. A class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy.

317. The common questions of law and fact enumerated above predominate over questions affecting only individual Class members.

318. The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

319. As such, the expense and burden of individual litigation would make it impracticable for proposed Class members to prosecute their claims individually.

**E.    Plaintiff(s) and Class Counsel Are Adequate**

320. Class Counsel and Plaintiff will fairly, adequately and vigorously represent and protect the interests of the proposed class members and has/have no interest antagonistic to those of the Class.

321. There are no defenses unique to Plaintiff(s).

322. Plaintiff's lead attorney (James C. Vlahakis) is an experienced consumer class action litigator who has defended over a hundred consumer-based claims since 1998 and has litigated over four dozen TCPA based putative class actions.

323. In conjunction with class counsel, Mr. Vlahakis has obtained Court approval of numerous TCPA class actions. *See, e.g., In Re Capital One Telephone*

47

*Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar TCPA based automated dialing system settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar TCPA based automated dialing system wrong party settlement); *INSPE Associates v. CSL BIotherapries, Inc.* (N.D. Ill.) ($3.5 million fax based settlement).

324.    Additionally, Mr. Vlahakis (as a former consumer class action defense attorney) has gained court approval of dozens of numerous **FDCPA** class actions.

325.    Mr. Vlahakis understands the types of defenses that are raised in TCPA class action as he defeated a TCPA class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013).

326.    Mr. Vlahakis also decertified a previously certified TCPA class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012).

327.    In litigating TCPA class actions, Mr. Vlahakis has ascertained the identities of putative class members individually and in conjunction with industry experts.

328.    Mr. Vlahakis has litigated petitions for declaratory relief before the FCC.

329.    Mr. Vlahakis' co-counsel are highly competent and experienced class action attorneys.

**E.    Injunctive and Declaratory Relief Are Warranted**

330.    FRCP 23(b)(2) provides that injunctive and declaratory relief are proper where "the party opposing the class has acted or refused to act on grounds that apply generally to the class."

331.    Here, the above violations apply generally to the proposed classes.

332.    For the above reasons, this Court should declare Defendants' misconduct unlawful and enjoin Defendant from further violating the TCPA, FDCPA and ICFA.

***Plaintiff hereby demands a trial of this civil action by jury.***

Respectfully submitted,


Plaintiff MELISSA DUCASTEL individually
and on behalf of all others similarly situated,

By: ___s/James Vlahakis_____
James Vlahakis (lead counsel)
SULAIMAN LAW GROUP, LTD.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 581-5456 telephone
jvlahakis@sulaimanlaw.com

*Additional counsel*

Omar T. Sulaiman
SULAIMAN LAW GROUP, LTD.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 575-8181 telephone
osulaiman@sulaimanlaw.com